## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 20-CR-286-RBW** |
| | : | |
| **v.** | : | |
| | : | |
| **HANALEI AIPOALANI,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Hanalei Aipoalani is scheduled to be sentenced on June 30, 2021 for embezzling more than $500,000 from AmeriCorps and for agreeing to take a bribe in connection with CARES Act funds. To affect his frauds, the Defendant abused multiple positions of trust and treated public funds ear-marked for the most vulnerable and desperate Americans as his own personal piggy bank. The Defendant stole more than $532,000 from AmeriCorps by fraudulently enrolling members, without their knowledge, and diverting living allowances issued in their name into bank accounts that he controlled while serving as the HR Director of a Hawaiian non-profit. The Defendant also agreed, while serving as the CARES Act Program Administrator for the City and County of Honolulu, to accept a bribe in return for approving multiple fraudulent grant applications made at the direction of Co-Conspirator 1, whose fraudulent grant applications Aipoalani assisted in preparing. The Defendant pleaded guilty on March 26, 2021 to one count of federal programs embezzlement in violation of 18 U.S.C. § 666(a)(1)(A) and one count of federal programs bribery in violation of 18 U.S.C. § 666(a)(1)(B).

By plea agreement, the parties agreed that the applicable offense level is 27, resulting in a guidelines range of 70 to 87 months' imprisonment. The United States Probation Office disagreed with the parties' Guidelines' calculations and calculated the offense level to be 25 and the advisory guidelines range to be 57 to 71 months' imprisonment. The government respectfully requests that

the Court sentence the defendant to 66 months of imprisonment and three years of supervised release along with mandatory restitution and a forfeiture money judgment.

I.    **The Defendant's Frauds**

A.  **AmeriCorps Fraud**

i.  **Background of AmeriCorps**

AmeriCorps is a federally funded network of national service programs that are intended to address critical community needs including increasing academic achievement, mentoring youth, fighting poverty, sustaining national parks, preparing for disasters, and more. It is the nation's largest grant maker and the service provided by AmeriCorps' members is critically important to vulnerable communities across the nation. AmeriCorps' national service members commit to service for a set period of time, usually a year, in exchange for a living allowance, funding to be used for college tuition, and other benefits. Full-time members who serve at least 1,700 hours per year will receive approximately $12,5000 per annual term of service. An AmeriCorps member who completes their service term is also eligible for an education award to be paid directly from AmeriCorps to the school or qualified lender. To qualify for the education award, the AmeriCorps grantee site where the member served their community had to certify that the member completed the required service hours.

ii.  **The Scheme**

Non-Profit 1 was an approved site location for AmeriCorps service, and it received AmeriCorps funding through the Hawaii Commission for National and Community Service (the Commission) on a cost-reimbursement basis to pay living allowances to the enrolled AmeriCorps members. From December 2014 through June 2019, Non-Profit 1 received approximately

$935,000 in AmeriCorps funds. More than half of this funding was based on fraudulent submissions for reimbursement made by the Defendant, which he then siphoned into bank accounts for his own benefit.

The Defendant served as Non-Profit 1's Human Resources Director from 2010 through May 2019. In 2013, the Defendant was officially debarred from any involvement in federal grant programs after being caught attempting to divert federal grant funds from a different grantee to his own personal bank account. The debarment was for a three-year period from April 2013 to April 2016. Nonetheless, starting in November 2014, the Defendant was permitted to administer Non-Profit 1's AmeriCorps program. In that capacity, the Defendant was responsible for tracking and reporting AmeriCorps member enrollment to the Commission for reimbursement. The Defendant was also responsible for certifying when members satisfactorily completed their service, qualifying them for an education award. The Defendant never informed Non-Profit 1 that he had been debarred from involvement in federal grant programs. When the Commission was notified of the Defendant's debarment, the Defendant created a document on Non-Profit 1's letterhead, purporting to be signed by the President of Non-Profit 1, claiming falsely that the Defendant had been replaced as the AmeriCorps authorized representative. In fact, the Defendant continued to run the AmeriCorps program, and the Finance Director of Non-Profit 1 was never apprised of the Defendant's debarment status.

From December 2014 to June 2019, the Defendant embezzled more than $527,000 in AmeriCorps funds by submitting fraudulent claims for reimbursement to the Commission, and by using his access as the HR Director of Non-Profit 1 to divert the stolen funds into bank accounts that he controlled or benefitted from. He did this in several ways.

First, the Defendant did not to report when an AmeriCorps member voluntarily left the program prior to the end of their term, and using his access as HR Director to Non-Profit 1's payment system, the Defendant changed the direct deposit information for the former members in order to divert continuing member living allowances into different bank accounts for his own benefit.

Second, the Defendant fraudulently re-registered at least nine former AmeriCorps members, without their knowledge, for additional terms of service at Non-Profit 1. Here, too, the Defendant used his access to the payment system to divert the additional living allowance payments to his own use.

Third, in or around September 2015, the defendant terminated the AmeriCorps service of an AmeriCorps member, B.M., early, falsely telling him that budget constraints required Non-Profit 1 to terminate his term early. However, instead of un-enrolling B.M., the Defendant accessed Non-Profit 1's payment system to divert continuing living allowance payments intended for B.M. to the Defendant's own personal use. According to B.M., he lost living allowance payments totaling $3,159 because of this unjust firing. *See* ECF 23 (Declaration of Loss).

Fourth, the Defendant created fraudulent invoices from a second non-profit, Non-Profit 2, run by Co-Conspirator 1, which falsely claimed that Non-Profit 2 was entitled to reimbursement of more than $97,000 for AmeriCorps living allowances allegedly paid by Non-Profit 2 to the Defendant's wife, Angelita Aipoalani, and an additional Non-Profit 2 employee. Using his authority at Non-Profit 1, the Defendant approved these fraudulent invoices and then caused them to be paid. As a result of this conduct, the Defendant and Angelita Aipoalani caused more than $69,000 to be deposited into a bank account held jointly in their names. In order to execute this

4

scheme, the Defendant transmitted fraudulent AmeriCorps registrations for 2015, 2016, and 2017, enrolling Angelita Aipoalani as an AmeriCorps member, despite knowing that she held full-time employment elsewhere and was not going to, nor did she, perform the required AmeriCorps service. In order to execute this fraud, the Defendant used his position as a senior advisor at Non-Profit 2 to add Angelita Aipoalani to Non-Profit 2's payroll system in order to receive payment for the supposed AmeriCorps service – for which Non-Profit 2 sought reimbursement from Non-Profit 1 – and which was never performed.

Fifth, the Defendant, using his authority at Non-Profit 1, diverted $9,000 in AmeriCorps funds to a bank account held by Defendant's friend.  In exchange for the $9,000 payment, ownership of a 2014 Ford Fusion Hybrid was transferred from Defendant's friend to Defendant and Angelita Aipoalani for their personal use.

In addition to more than $69,000 of AmeriCorps money fraudulently stolen based on Angelita Aipoalani's fraudulent registration as an AmeriCorps member, the Defendant and Angelita Aipoalani applied for $11,505 in AmeriCorps education awards for Angelita Aipoalani. To support those applications, the Defendant falsely certified to AmeriCorps that Angelita Aipoalani had served at least 1,700 hours per year as an AmeriCorps member, which he full well knew she did not. Based on these false certifications, AmeriCorps approved an award in November 2016 for $5,730 – which was paid directly to Angelita Aipoalani's student loan holder – and approved a second award in November 2017 for $5,775, which was not paid.

### iii.  Disposition of Proceeds

The FBI traced the approximately $429,000 of fraudulent proceeds from this scheme that were diverted from Non-Profit 1. The Defendant withdrew $75,000 of the proceeds in cash, and

their subsequent use is unknown. The remainder was spent on the Aipoalanis' lifestyle, including more than $117,000 on dining and entertainment, $56,000 on travel and hotel expenses, and more than $87,000 on retail including more than $3,534 at Kay Jewelers, $1,700 at Sephora, $1,300 at nail salons, $1,400 at Victoria's Secret, $3,600 to Massage Envy, and 87 separate trips to Old Navy totaling more than $9,400.

The Aipoalanis spent their stolen money on lavish vacations including $3,906 to the Ala Moana hotel ([https://www.alamoanahotelhonolulu.com/](https://www.alamoanahotelhonolulu.com/)), $3,149 to Disney Resorts, $3,682 on a timeshare at the Disney Aulani resort ([www.disneyaulani.com](www.disneyaulani.com)), $1,412 at the Makahika restaurant at the Disney Aulani resort, more than $22,385 at Marriott Ko'Olina Beach Club ([http://koolina.com/accommodations/marriotts-ko-olina-beach-club/](http://koolina.com/accommodations/marriotts-ko-olina-beach-club/)).

The dining expenses, in particular, reveal how Aipoalanis used the stolen AmeriCorps money to fund a luxurious lifestyle, including, for example, a $395 dinner at Ben & Jack's Steakhouse in New York City, a $319 dinner at Blue Fin Times Square, a $303 dinner at the Four Seasons Fish House, a $390 dinner at MW restaurant, trips to California Pizza Kitchen totaling $2,785, trips to the Cheesecake Factory totaling $4,085, trips to "Da Crawfish and Crab" totaling $2,217, trips to DB Grill totaling $2,106, trips to Kapolei Karaoke costing $1,556, and trips to Roy's Ko'Olina costing $4,814. The Aipoalanis spent more than $3,287 of AmeriCorps money at the water park, "Wet 'N' Wild Hawaii," more than $500 on tickets to Disneyland, and more than $1,000 on movie tickets. The Aipoalanis then leased a brand new 2020 BMW X3 and spent more than $10,000 of the stolen money on lease payments.

The FBI also traced the approximately stolen funds diverted through the scheme with Angelita Aipoalani to embezzle AmeriCorps funds through Non-Profit 2. The FBI identified 82

cash withdrawals totaling $27,764.20, 352 transactions totaling $10,959.83 for dining and entertainment and, 37 transactions totaling $9,922.03 in hotel expenses.

The Defendant flaunted his lifestyle on social media. The following was obtained from the Defendant's public Instagram account @drhanz79:



*Ferrari rented for the Defendant's birthday (January 2019)*



*Defendant's 40th birthday at the Ko'Olina Beach Resort (January 2019)*



*Angelita Aipoalani pictured flying First Class from Hawaii to San Francisco (Summer 2018)*



*Family vacation to Disney's Aulani resort (July 2018)*



*Trip to New York City and $395 dinner at Ben and Jack's Steakhouse (December 2017)*



*Vacation to Universal Studios (2015)*



*Vacation to Las Vegas (2015)*

### B.  CARES Act Bribery Scheme

In August 2020, the Defendant was hired to serve as the "CARES Program Administrator"

for the Department of Community Services (DCS) of the City and County of Honolulu ("City and

County"). City and County received approximately $387 million from the Coronavirus Relief Fund ("CRF") that was created under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was passed by Congress in March 2020 to provide financial relief to those suffering economic effects from the COVID-19 pandemic. The CRF was distributed to states and localities to help address losses incurred due to COVID-19. Government entities – such as City and County – that received money from the CRF could use the funds to, among other things, make grants to small businesses to reimburse costs incurred by those small businesses due to the pandemic. The funds had to be used for costs incurred between March 1, 2020 and December 30, 2020.

City and County allotted approximately $166 million of the CRF funds to DCS to award grants "targeted towards addressing social and human needs of residents of Hawaii due to impacts of the pandemic." As a result of the funding, DCS obtained approval to hire a "CARES Program Administrator" to manage DCS's CRF grant program. The position itself was funded by CRF monies. The Defendant was hired to serve as the "CARES Program Administrator" and his responsibilities included, among other things, developing and executing programs related to the CRF, coordinating contracting, and coordinating public messaging.

From nearly the moment he was hired, the Defendant began coaching Co-Conspirator 1 about how to fashion grant applications through two different entities controlled by Co-Conspirator 1 and operated on Hawaii Island. On August 25, 2020, the Defendant began advising Co-Conspirator 1 as to how to modify the "scope and reach" of his company to qualify for the funds. That same day, the Defendant sent Co-Conspirator 1 the grant application and began suggesting the content of Co-Conspirator 1's grant applications:

| Date | From | To | Body of Text Message |
|------|------|------|------|
| 8/25/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Check your email. I sent you the Grant Application. |
| 8/25/2020 | Hanalei Aipoalani | Co-Conspirator 1 | My earlier text was an idea of what you could propose. |
| 8/25/2020 | Co-Conspirator 1 | Hanalei Aipoalani | How many people vying for these or this contracts. |
| 8/25/2020 | Hanalei Aipoalani | | Non Compete; based on need and plan on delivering in a timely manner. Basically, expenses must be incurred by 12/30/20. |
| 8/25/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Please tell me you the administrator !!!??? |
| 8/25/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Yes. I am the CARES Program Administrator for the City. I accepted the offer on the Friday that we were in Hilo; literally just before the training with Management started. |
| 8/25/2020 | Hanalei Aipoalani | Co-Conspirator 1 | If [Employee 1] or another member of [Non-Profit 2] could be named as Executive Director, [Non-Profit 2] Community Engagement; then it would go over well. |

The Defendant continued coaching Co-Conspirator 1 with respect to the contents of his grant applications through the month of August, including drafting entire portions of the application for Co-Conspirator 1. The Defendant then began forwarding Co-Conspirator 1's grant proposals to various agencies and recommending Co-Conspirator 1's company to help another non-profit with processing applications for funds for Hawaii Island. When Co-Conspirator 1 thanked him, the Defendant replied, "My pleasure, boss man. Let's begin to rock and roll and make $." Throughout early September, the Defendant continued to direct the content of Co-Conspirator 1's applications, including precise wording and budget items. When Co-Conspirator 1 raised a concern that the it was "[p]robably not a good idea to use similar narrative for [Non-Profit 2] grant because of [Company 1] application[,]", the Defendant assured him, "You may; it will be two

separate unlinked groups." After receiving a proposed budget from Co-Conspirator 1 for Company 1, the Defendant directed him to increase the requested funds, texting, "[i]t could be a little more. Closer to $650k[.]"

On September 15, 2020, the Defendant texted with Co-Conspirator 1 about how the funds would be shared. Co-Conspirator 1 told the Defendant, "I can hide your employment FYI." On September 16, 2020, the Defendant and Co-Conspirator 1 had the following text exchange:

| Date | From | To | Body |
|------|------|-----|------|
| 9/16/2020 | Hanalei Aipoalani | Co-Conspirator 1 | The goal is to fund both applications—a little more than $1M; of which about $600K will be gravy money with the balance being tied to some work/lift. |
| 9/16/2020 | Co-Conspirator 1 | Hanalei Aipoalani | No problem.  My favorite saying. Easy to give what I have versus to give when no more !!!!  We can make it work !!! |
| 9/16/2020 | Co-Conspirator 1 | Hanalei Aipoalani | You and I will open a LLC on Oahu !!! |
| 9/16/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Yes, let's do it ASAP. |
| 9/16/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Our wives could be the principles. |
| 9/16/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Do you have a LLC? |
| 9/16/2020 | Co-Conspirator 1 | Hanalei Aipoalani | I'll teach you how to launder !!  Lol |
| 9/16/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Let's do this. |
| 9/16/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Create a LLC for Angie.<br>I already have my own.<br><br>I will show you how to do it once we get funding and will contract your company.   Then you will contract my company.    Lol.   Easiest way<br><br>We will make sure that we keep enough for taxes.  And we will make enough expenses to break even or just make a little. |
| 9/16/2020 | Hanalei Aipoalani | Co-Conspirator 1 | I'm all in. |

Several days later the Defendant updated Co-Conspirator 1 that Company 1's proposal had

13

been added to EDAH (Economic Development Alliance of Hawaii) and Non-Profit 2's application was also coming up for approval. The Defendant assured Co-Conspirator 1 that the applications would go through, explaining "I chair those meetings." Co-Conspirator 1 assured the defendant that he would "protect" him and that they would "make this work good for everyone":

| Date | From | To | Body |
|------|------|----|------|
| 9/18/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Update. [Company 1] has been added to EDAH grant proposal; which will be reviewed and approved next Monday. |
| 9/18/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Nice!!!  Then let's talk as soon as you know how much and then we shall figure some stuff out !!  Thanks |
| 9/18/2020 | Hanalei Aipoalani | Co-Conspirator 1 | It's the full amount—+$460K |
| 9/18/2020 | Hanalei Aipoalani | Co-Conspirator 1 | [Non-Profit 2] app is also on next Monday's agenda for approval. |
| 9/18/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Seriously !!  You think both will go thru?? |
| 9/18/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Yes. I chair those meetings. Once green lighted, HCF will take 2-3 days to contract. |
| 9/18/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Ok. I want to make sure we protect you.  We will make this work good for everyone !!! |
| 9/18/2020 | Hanalei Aipoalani | Co-Conspirator 1 | 👍 |

Four days later, on September 18, 2020, the Defendant told Co-Conspirator 1 that Company 1's grant was being funded and that Non-Profit 2's was on the upcoming agenda. The next day, the Defendant and Co-Conspirator 1 discussed the bank accounts they would be using:

| Date | From | To | Body |
|------|------|----|------|
| 9/23/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Go open up some credit union accounts in you and Angie name. Make sure get savings accounts. Just FYI when you take money out of savings account it is treated differently then checking accounts. Can't tell you why but that is how you funnel cash. FYI.  Lol.  So I will |

14

| Date | From | To | Body |
|------|------|-----|------|
| | | | use multiple accounts to send you checks and you deposit into savings accounts. |
| 9/23/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Between me and Angie, we have 4 savings accounts with Aloha Pacific FCU. |
| 9/23/2020 | Co-Conspirator 1 | Hanalei Aipoalani | Perfect. We will be in touch.   Thanks |

The next day, the defendant told Co-Conspirator 1 that he was "pushing to advance [Non-Profit 2's] application[.]" On September 28 and 29, 2020, the Defendant informed Co-Conspirator 1 that Non-Profit 2's application was approved at $350,000 and that the Defendant was able to "bump up" the grant to "just under $420K." The Defendant than directed Co-Conspirator 1 to prepare backdated certifications claiming that nine Honolulu residents who had been adversely impacted by COVID-19 had been certified through 24-hour online training. The Defendant told Co-Conspirator 1 on September 29, 2020:

| Date | From | To | Body |
|------|------|-----|------|
| 9/29/2020 | Hanalei Aipoalani | Co-Conspirator 1 | Like [Company 1], most of these funds, if not all, will be gravy. |

Based on the text messages above, the Defendant and Co-Conspirator 1 plainly contemplated that $600,000 of the contracts would be "gravy" – meaning, profits – that they would split between themselves. Indeed, the Defendant believed that "most of these funds, if not all, will be gravy." Therefore, the government submits, and the PSR agrees, that the value of the attempted bribe is approximately $300,000. PSR ¶ 85.

Based on the assistance from the Defendant and the Defendant's agreement to approve the grant applications in return for the bribe, Co-Conspirator 1 submitted two fraudulent applications for CARES Act funds which the Defendant knew fraudulently claimed expenses that had not actually been yet incurred. *See* Statement of Offense ¶ 48.

On October 8, 2020, federal agents from AmeriCorps OIG and the FBI executed search warrants on the Defendant's residence, the Defendant's storage unit, Non-Profit 2, and the Hawaii Commission. After the search warrants, Non-Profit 2 and Company 1's CARES Act grant applications were withdrawn, and no funds were disbursed. Had the search warrants occasioned by the Defendant's AmeriCorps scheme not disrupted this bribery scheme, $845,000 of the limited funds allocated to Hawaii under the CARES Act for actual expenses incurred as a result of the COVID-19 pandemic would have been paid out to Co-Conspirator 1's companies for "expenses" that had not yet even been incurred so that the Defendant and Co-Conspirator 1 could share the "gravy" and personally enrich themselves.

## II.      Sentencing Guidelines

### A.  The Plea Agreement and PSR

By plea agreement, the parties agreed that the defendant's total offense level was 30 and that after application of a three-point reduction for acceptance of responsibility, the Estimated Offense Level would be at least 27 resulting in an estimated Guidelines range of 70 to 87 months' imprisonment. *See* Plea Agreement ¶ 5(A)-(C). This analysis was based on the agreement that the two offenses of conviction group pursuant to U.S.S.G. § 3D1.2(d).

The PSR writer disagreed with the parties' Guidelines analysis and found that the offenses do not group. *See* PSR ¶ 76. Accordingly, the PSR found that the adjusted offense level for Count One is 24, *id.* ¶¶ 77-83, and the adjusted offense level for Count Two is 26, *id.* ¶¶ 84-89. The PSR calculated a two-level increase in offense level based on the multiple count adjustment pursuant to U.S.S.G. §3D1.4 for a combined adjusted offense level of 28. After application of U.S.S.G. §3E1.1, the PSR calculated a total offense level of 25. The PSR found that a three-level reduction,

16

pursuant to U.S.S.G. § 3E1.1, is warranted because the defendant demonstrated acceptance of responsibility by pleading guilty pre-Indictment and timely notifying the government of his intention to plead guilty. PSR ¶¶ 95-96.

### B.  Abuse of Position of Trust

U.S.S.G. § 3B1.3 imposes a two-level enhancement for abuse of trust. Application note 1 explains that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

In determining whether a person occupied a position of public trust, a court must consider "[t]he extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendants' level of specialized knowledge; defendant's level of authority in the position; and the level of public trust." *United States v. Robinson*, 198 F.3d 973, 977 (D.C. Cir. 2000) (quoting *United States v. Shyllon*, 10 F.3d 1, 5 (D.C. Cir. 1993)).

The parties did not address the abuse of position enhancement by plea agreement because the parties' found the offenses grouped and therefore calculated the combined offense level solely pursuant to U.S.S.G. § 2C1.1, to which § 3C1.1 is inapplicable. *See* U.S.S.G. § 2C1.1 n. 6 ("Do

not apply § 3B1.3"). After finding the counts do not group, the PSR calculated the offense level for Count One pursuant to § 2B1.1 and found the two-level enhancement for abuse of trust applies to Count One. The government agrees.

There is clear evidence that the Defendant's position provided him the freedom to commit a difficult-to-detect wrong by dint of the fact that it was not noticed for period of multiple years. The defendant's duties, as compared to other employees, including his access to the HR payment system and his unique role certifying the service of AmeriCorps members and the accordant public trust that naturally inheres to that role is precisely the type of position contemplated by the abuse of trust enhancement. It is also plainly the case that the Defendant's position of public trust facilitated the commission of the offense. *See* U.S.S.G. §3B1.3 n. 1. But for the Defendant's role as the HR director of Non-Profit 1, responsible both for the payment of employees as well as the certification of AmeriCorps service, the Defendant would have been entirely unable to fraudulently enroll AmeriCorps members or to divert the resulting living allowances for his own benefit.

Accordingly, although the parties did not address this enhancement in their plea agreement, the government submits that the PSR is correct in applying this enhancement.[1]

### C.  Role Adjustment

By plea agreement, the parties agreed that a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) applies because the Defendant was an organizer, leader, manager, or supervisor in any criminal activity other than that described in §3B1.1(a) or (b). The PSR found that a four-level

---

[1] The parties also agreed, by plea agreement, that neither party would seek an offense-level calculation different from the Estimated Offense Level calculated in paragraph 5(A). *See* Plea Agreement ¶ 5(C). In the Reservation of Allocution, the parties "reserve[d] the right to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein[.]" Because the PSR's calculations differed from the parties' calculations it is appropriate under the terms of the government's plea agreement for the government to address the correctness of the application of § 3B1.3.

increase applies because the defendant was an organizer or leader in an otherwise extensive offense pursuant to U.S.S.G. § 3B1.1(a). PSR ¶ 65. Application note 1 defines a "participant" as a person who is criminally responsible for the commission of the offense, but who need not have been convicted. With respect to Section 3B1.1(a)'s "otherwise extensive" prong, the Court of Appeals for the D.C. Circuit has concurred with the Court of Appeals for the Second Circuit's analysis in *United States v. Carrozzella*, holding, "[w]e further agree with the Second Circuit that, at a minimum, Section 3B1.1's 'otherwise extensive' prong demands a showing that an activity is the functional equivalent of an activity involving five or more participants." *United States v. Wilson*, 240 F.3d 39, 49 (D.C. Cir. 2001) (quotation omitted) (citing *United States v. Carrozzella*, 105 F.3d 796, 802 (2d Cir. 1997)). Based on *Wilson's* adoption of *Carrozella*, the government submits that the facts of this case support a two-level enhancement pursuant to § 3B1.1(c).[2]

### D. Guidelines Calculations

Based on the foregoing, the United States submits that the Guidelines calculations is as follows:

<u>Count One</u>
| | |
|---|---|
| Base Offense Level (§ 2B1.1) | 6 |
| Specific Offense Characteristic (§2B1.1(b)(1)(G)) | +12 |
| *Loss of more than $250,000 and less than $550,000* | |
| Adjustment for Role in the Offense (§3B1.1(a)) | +2 |
| Abuse of Trust (§3B1.3) | +2 |
| **Adjusted Offense Level (Count One)** | **22** |

<u>Count Two</u>
| | |
|---|---|
| Base Offense Level (§ 2C1.1)  (public official) | 14 |
| Specific Offense Characteristic (§2B1.1(b)(1)(G)) | +12 |
| *Bribe of approximately $300,000* | ___ |

---

[2] The government notes that application of a two-level or four-level enhancement for role in the offense pursuant to § 3B1.1 results in the same adjusted offense level because Count Two has a higher adjusted offense level than Count One and both the two-level and four-level role adjustment result in the same multiple unit offense level adjustment pursuant to U.S.S.G. § 3D1.4.

| | |
|---|---|
| **Adjusted Offense Level (Count One)** | **26** |
| Multiple Count Adjustment (§ 3D1.4) | <u>+2</u> |
| Combined Adjusted Offense Level | **28** |
| Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Acceptance of Responsibility (§ 3E1.1(b)) | <u>-1</u> |
| **Total Offense Level** | **25** |

### E.  Criminal History and Guidelines Range

The defendant has zero criminal history points, placing him in Criminal History Category I. With a total offense level of 25, as calculated by the PSR, and a Criminal History Category I, the recommended imprisonment range is 57 months' to 71 months' imprisonment.

### III.    The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

### A.    The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

The Defendant's offenses are egregious. He abused his position of trust at Non-Profit 1 to steal more than $500,000 from a taxpayer-funded federal program that is designed to address the

needs of some of the country's most vulnerable residents. In addition to fraudulently enrolling his wife and re-enrolling former members without their knowledge, the Defendant was so motivated to rob this program that he went so far as to *fire* an AmeriCorps member mid-term in order to divert a portion of the member's living allowance for the Defendant's own benefit.

This was not an isolated incident but rather a systematic pattern of robbing the federal programs that the Defendant was tasked with administering and safeguarding. The systemic theft from AmeriCorps occurred over a five-year period and began when the Defendant was already debarred from involvement with federal grants for a prior attempt to divert grant funds. It was then followed immediately with an attempt to personally profit from his role in disbursing CARES Act funds. The COVID-19 pandemic devasted communities nationwide. Untold numbers of employees lost their jobs and many entire industries were decimated. The Coronavirus Relief Fund was established by the CARES Act to cover necessary expenditures that were incurred as a result of the COVID-19 pandemic. The funds allocated to City and County's DCS were to be "targeted towards addressing social and human needs of residents of Hawaii due to impacts of the pandemic." The Defendant's role was the CARES Act Program Administrator was a very special position of trust. He served as a gatekeeper to ensure that the limited amount of money that was allocated to help ameliorate some of the devastating economic consequences of the COVID-19 pandemic would be directed towards those in the most need. Instead, just like the AmeriCorps program that he was entrusted to direct, he treated the CRF as his own personal piggy bank, and planned to divert much-needed funds towards Co-Conspirator 1's fraudulent grant applications rather than the programs and people who truly needed the money, so that he could financially benefit from the transaction.

In his sentencing memorandum, the Defendant asks the Court to consider the fact that his incarceration will leave his family without an income and that he will owe restitution to AmeriCorps and that he has already surrendered his family vehicle. The government notes that although he did surrender the 2014 Ford Fusion that was purchased with fraud proceeds, as of the date of the required financial disclosures, the Defendant was still paying $840 a month to lease a 2020 BMW X3. Further, restitution to AmeriCorps is not a punishment or imposed lieu of punishment but is, instead, required under the MVRA to make the victim whole and to ensure that perpetrators do not financially profit from their crimes.

The Defendant also asks this Court to impose a below Guidelines sentence because his crimes were "entirely monetary[,]" and because he did not pollute air or water or physically assault or injure someone. Defendant's Sentencing Memorandum at p. 8. The government respectfully disagrees with this assessment of the Defendant's crime. This was not a victim-less monetary crime. AmeriCorps does not have an unlimited budget – instead they have a fixed budget, funded by taxpayer money, which is allocated to pay living stipends for volunteers who work in the most vulnerable and marginalized communities, including on the life and health-threatening issues of pollution, and including programs to assist people who have been victims of crimes.[3] By stealing more than $500,000 from AmeriCorps to fund his own luxurious lifestyle, the Defendant precluded those limited funds from being used for their purpose – to help the most vulnerable members of our society.

---

[3] By way of example, AmeriCorps funds the AmeriCorps Victim Assistance Program. https://serviceyear.org/avap/.

**B.      The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Although the Defendant requests a significant variance from the Guidelines, a sentence of imprisonment here is necessary for both specific deterrence and general deterrence. Stealing from public funds earmarked for vulnerable Americans is a serious offense that warrants a significant period of incarceration. Although there is no question that the Defendant is well-liked in his family and community, he is being sentenced today for fraud on federal programs that spanned many years and multiple programs and his course of conduct demonstrates a genuine need for specific deterrence. Indeed, had the Defendant not been caught by the diligent efforts of the AmeriCorps Office of Inspector General and the FBI, there is little doubt that he would be defrauding both programs to this day.

AmeriCorps funds are distributed through a de-centralized process that relies upon the grantees and the subgrantees to honestly account for the service of AmeriCorps members. It is critical that the Defendant's sentence serve as a deterrent to others who would take advantage of this system to line their own pockets rather than administer programs that are desperately need by vulnerable Americans.

Similarly, the CARES Act funded a $150 billion Coronavirus Relief Fund, which is being administered by state and local governments throughout the country. It is critically important at this moment in our nation's history that the funds allocated to help those suffering from the effects from the COVID-19 pandemic are protected by deterring those who would divert those funds for their own financial gain. There is a significant amount of money now available to struggling communities through both the CARES Act and the American Rescue Plan, which poses unique and widespread risk for taxpayer money ear-marked for the most vulnerable Americans to be stolen

23

by unscrupulous people who are tasked with safe-guarding it. The Defendant's sentence for agreeing to take a bribe with respect to the administration of grants under the CARES Act must send a clear message that there are serious criminal consequences for this type of conduct in order to deter others who may be tempted to personally benefit from the COVID-19 pandemic and to deprive vulnerable Americans from help that is desperately needed.

### C.     The History and Circumstances of the Defendant

The Defendant's convictions here are a culmination of a long pattern of attempting to enrich himself by fleecing programs designed for the most vulnerable Americans. While employed at Non-Profit 1, he was already debarred from any involvement in a federal grant program after being caught attempting to divert federal grant funds from a different grantee to his own personal bank account. He nonetheless proceeded to run Non-Profit 1's AmeriCorps program and to systematically steal more than $500,000 over the course of five years. After obtaining the position of CARES Act Administrator he immediately attempted to find a way to turn it to his own financial gain – above and beyond his salary that was already being paid by public funds. His text messages with Co-Conspirator 1 reveal that he was persistent in his attempts to find a way to turn his position of trust to his own financial advantage in concert with Co-Conspirator 1, who was a ready and willing partner in crime.

The Defendant reports that he comes from a close-knit family that was very involved with serving the community. His persistent greed and theft from public programs are indefensible and were motivated by greed. While AmeriCorps members were serving their communities and subsisting on only $12,500 a year, the Defendant was spending hundreds of thousands of stolen public funds on lavish vacations, restaurants, shopping, massages, and a new BMW X3. He was

motivated by personal gain and his actions came at a very real cost to both the AmeriCorps members who were deprived of the opportunity to participate in a year of service and the countless community members that those AmeriCorps members would have helped and supported. But for the withdrawal of Co-Conspirator 1's grant applications after the execution of search warrants, his willingness to be bribed in return for approving Co-Conspirator 1's applications would have deprived people and organizations that actually suffered harm from the COVID-19 pandemic from the funds that the Defendant was willing to divert to Co-Conspirator 1 based on Co-Conspirator 1's fraudulent grant applications.

The Defendant asks this Court to vary dramatically downward from the Guidelines because he accepted responsibility and entered into a pre-Indictment plea. The Government agrees that the Defendant should be lauded for accepting responsibility for his conduct and the government agrees that his pre-Indictment plea has saved the government both time and resources. However, that acceptance is incorporated into the Guidelines range through the three-level reduction in offense level pursuant to 3E1.1 Further, the Defendant obtained significant benefits in return for his pre-Indictment plea. In particular, the Defendant was not subject to aggravated identity theft charges for the use of at least nine individuals' names in connection with the fraudulent AmeriCorps enrollments; a charge that carries with it a mandatory consecutive two-year prison term.

The Defendant argues that he should be sentenced below the Guidelines because imprisonment will prohibit him from working and paying restitution. Respectfully, the government submits that it is not appropriate to impose disparate sentences based on a defendant's ability to earn money and thus pay restitution. Such an approach would create two classes of defendants –

those with significant earning potential and those without – and would result in a class-based system of punishment that is antithetical to our system of justice.

Finally, the Defendant argues that he should be sentenced below the Guidelines because he has endured the loss of face in his community. While the government acknowledges that the loss of reputation and respect is a painful and real consequence of being caught committing a crime, this was a consequence entirely of the Defendant's own making. His reputation in the community – one of public service and generosity – was a house of cards built on many years of systematically defrauding the very community that he purported to serve. As with the ability to earn a salary for restitution, the government submits that there is no place in this justice system for a stratified system of punishments where prominent members of the community receive significantly lesser sentences because they have endured the loss of their reputation whereas lower profile defendants are sentenced to longer prison terms because they perhaps had no reputation to lose.

### D.    Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences."

26

*Id.* at 533. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

Courts in this District have imposed sentences that reflect the serious nature of embezzling from federal programs and corrupting those programs through bribery.

In 2019, James King pleaded guilty to violations of 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 201(b)(2), and 18 U.S.C. § 1519. In his role as an official at the Department of Veterans Affairs (VA), King took bribes to enroll disabled military veterans in three for-profit schools and facilitate over $2 million in payments from the VA's Vocational Rehabilitation & Employment program to those schools based on information he knew to be false. He also falsified a site report to obstruct a VA investigation into the quality of education at one of the three schools. King was sentenced to 132 months in prison followed by three years of supervised release, and to pay $155,000 in restitution to the VA. *See United States v. King*, 18-cr-318-JDB (D.D.C.).

In 2019, Ronnie Simpkins pleaded guilty to violating 18 U.S.C. § 201(b)(2) by accepting bribes from government contractors. As a government contract officer at the General Services Administration (GSA), Simpkins accepted over $12,000 in cash and goods from a company's officials to help that company maintain a government contract despite not meeting program requirements. Based on Simpkins' offense level of 15, the advisory Guidelines recommended a sentence of 18-24 months. Simpkins was sentenced to 21 months in prison followed by one year of supervised release, a $10,000 fine, and a money judgment of $12,000. *See* United States v.

Simpkins, 19-cr-403-TNM (D.D.C).

In 2013, Mark Adams pleaded guilty to violating 18 U.S.C. §§ 1341, 1343, and 1349 after embezzling more than $1 million from the U.S. Agency for International Development (USAID)'s global health program. In his role as the deputy director of a private USAID contractor, Adams submitted and approved a total of 35 fraudulent invoices, ultimately paid for by USAID, for services supposedly rendered by Adams' wife and friends. These fraudulent invoices generated more than $1.084 million between 2006-2010, most of which was received by Adams and his wife. Adams was sentenced to 51 months in prison followed three years of supervised release, five years of probation (first six months under home confinement), and restitution of $1,084,499. *See United States v. Adams et al.*, 12-cr-93-BAH (D.D.C.).

The Defendant submits that the Court should avoid unwarranted sentencing disparities by sentencing him to the average fraud sentence in the D.C. Circuit in 2020. Defendant's Sentencing Memorandum at 5-6. The Court should not adopt this approach. First, nearly all Defendants who were sentenced during 2020 were sentenced during a once-in-a-century pandemic. Second, the average of all fraud sentences is not a valid methodology to determine how similarly situated defendants have been sentenced. The average sentence encompasses all fraud cases, from zero loss cooperator pre-indictment pleas to multi-million-dollar fraud cases sentenced after trial. The annual average is also a result of the types of cases brought each year, which can vary dramatically. The variability of this approach is best demonstrated by its significant variation year by year. For example, in 2019, the average fraud sentence in the D.C.

Circuit was 13 months.[4]  In 2018, the average fraud sentence in the D.C. Circuit was 25 months.[5]
And, in 2017 the average fraud sentence in the D.C. Circuit was 27 months.[6]  Certainly, the
defendant's sentence should not be a product of what year he is sentenced in. Because the
Guidelines were crafted to incorporate loss amounts and aggravating and mitigating factors and
to apply equally nationwide, it is the best framework with which to avoid unwarranted
sentencing disparities. This is particularly appropriate, here, where most of the conduct at issue
occurred in the state of Hawaii, and not in Washington, D.C. The government respectfully
submits that this Court should disregard the Defendant's request to be sentenced to the average
2020 fraud sentence in the D.C. Circuit and should instead consider the advisory Guidelines'
range, the defendant's conduct and characteristics, and similar cases involving both
embezzlement and bribery from federal programs when fashioning a sentence that avoids
unwarranted sentencing disparities.

IV.     **Restitution and Forfeiture**

A.  **Restitution to AmeriCorps**

Restitution is mandatory under 18 U.S.C. § 3663A. In his plea agreement, the Defendant
agreed to pay restitution in the amount of $527,000. ECF 14 ¶ 11. This amount erroneously omitted
the $5,730 paid by AmeriCorps in response to Angelita Aipoalani's fraudulent application for an
educational grant. Restitution for the $5,730 education award is also mandatory under the MVRA.
Accordingly, the Court should order the Defendant to pay a total of $532,370 in restitution to

---

[4]  *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/dcc19.pdf at p. 11.

[5]  *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/dcc18.pdf at p. 11.

[6]  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/dcc17.pdf at p. 11.

AmeriCorps, of which $74,730 is owed jointly and severally with co-defendant Angelita Aipoalani, 20-cr-290-RBW.

### B.  Restitution to B.M.

As part of his scheme to defraud AmeriCorps, Hanalei Aipoalani fired AmeriCorps member B.M. in the middle of his AmeriCorps term in order to divert the living allowances in B.M.'s name into his own bank accounts. B.M. has submitted a Victim Impact Statement and stated that he lost $3,159 in AmeriCorps member living allowances as a result of the Defendant's conduct. *See* ECF 23. Pursuant to 18 U.S.C. § 3553A(a)(2), a "victim" for purposes of restitution, "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." B.M. was directly harmed by Aipoalani's conduct in furtherance of the embezzlement scheme and the Court should order the Defendant to pay $3,159 in restitution to B.M.

### C.  Forfeiture

As part of his plea agreement, the Defendant has agreed to a forfeiture money judgment of $527,000 and the forfeiture of a 2014 Ford Fusion Hybrid, purchased with proceeds of the fraud. The 2014 Ford Fusion Hybrid has been surrendered to the FBI. *See* ECF 15 (Consent Order of Forfeiture).

### V.    <u>Conclusion</u>

The government respectfully submits that a sentence of 66 months' imprisonment, in the middle of the advisory Guidelines range, three years supervised release, and restitution and

forfeiture as described herein is an appropriate and fair sentence in light of the offense conduct, the need for specific and general deterrence, and the history and characteristics of the Defendant. The Defendant's convictions are a result of many years of systematically abusing a position of trust to steal more than $500,000 of taxpayer money intended for the most vulnerable communities. His embezzlement not only deprived the community of the services provided by AmeriCorps programs but also deprived volunteers from the opportunity to serve in this important program. But for the diligence of the investigators in this case, an additional $845,000 of CARES Act funds would have been stolen, rendering them unavailable to companies and people who had endured true hardship as a result of the COVID-19 pandemic. A sentence of 66 months' imprisonment will appropriately punish the Defendant for his conduct, provide specific deterrence from future fraud, and send a clear message that there are significant consequences for robbing public programs earmarked for vulnerable Americans by abusing positions of trust.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
for the District of Columbia
D.C. Bar No. 415793

By:   _Leslie a. Goemaat_
LESLIE A. GOEMAAT
MA Bar No. 676695
Assistant United States Attorney
Fraud Section
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.   20530
Office: 202-803-1608
Leslie.Goemaat@usdoj.gov